Sara J. Van Dyke, pro se
20 East 35th Street, Apt. 14L
New York, NY 10016
(212) 725-2706 *Phone and fax*
sjvdnyc@hotmail.com *Email*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: 1-10-2013

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SARA J. VAN DYKE, <br><br> Plaintiff, <br><br> -against- <br><br> Partners of DEBEVOISE & PLIMPTON LLP, BREAKING MEDIA, INC., PAUL GALLIGAN, and DOES 1 - 6, <br><br> Defendants | Judge Daniels <br><br> Civil Action No. 12 CV 8354 <br><br> **AFFIRMATION IN OPPOSITION TO DEFENDANT PAUL GALLIGAN'S MOTION TO DISMISS** |

I, Sara J. Van Dyke, affirm under penalty of perjury that:

I, Sara J. Van Dyke ("Plaintiff"), am the plaintiff pro se in the above entitled action, and respectfully submit this affirmation in opposition to the motion dated December 20, 2012 made by attorneys for defendant Paul Galligan ("Galligan") asking that the Court dismiss Plaintiff's Complaint dated November 15, 2012, in lieu of answer, pursuant to Federal Rules of Civil Procedure 12 (b)(6).

I have personal knowledge of facts which bear on this motion.

The motion should be denied because (i) Galligan's denials that he forwarded Plaintiff's emails are not credible and raise questions of material fact to be determined by a fact finder;

1

(ii) the Complaint does allege wrongdoing by Galligan which supports causes of action for emotional distress; (iii) Galligan did have a duty in respect of Plaintiff; (iv) the Complaint, construed liberally, does properly alleged a causes of action for intentional and negligent infliction of emotional distress, and (v) Plaintiff is entitled to relief for the emotional distress caused by Galligan and the other defendants.

## TABLE OF CONTENTS

**Page**

I.   Statements that Galligan Did Not Forward Plaintiff's Emails
     are not Credible                                                    4

II.  Galligan's Wrongdoing Includes His Disingenuous, High-handed
     "Investigation"                                                     10

III. Galligan Owed a Duty of Care to Plaintiff, Especially after Plaintiff
     put Galligan on Notice of the Harassing Above the Law Comments      14

IV.  Plaintiff's Claims for Emotional Distress Are Sufficiently Alleged  14

V.   Plaintiff is Entitled to Relief from Galligan for Emotional Distress 19

I.     **Statements that Galligan Did Not Forward Plaintiff's Emails are not Credible**

Galligan's motion to dismiss claims that he did not forward Plaintiff's emails to anyone. This is not credible. Plaintiff's August 7, 2011 email to Galligan is a lengthy response to Galligan's "letter closing investigation," an investigation regarding allegations of a building worker's sexual harassment of a housekeeper (see Comp. §32). Based on her extensive experience, Plaintiff can attest that emails such as this one are routinely forwarded, distributed, or otherwise shared with (i) other lawyers within the firm; (ii) the client; and (iii) other interested, non-adversarial parties where confidentiality is not at issue. Plaintiff's August 7, 2011 email is highly critical of a former Board member of her co-op, who was a partner at Sidley & Austin LLP ("Sidley"). If Galligan's claim can be believed, the Sidley partner never received Plaintiff's August 7, 2011 email accusing him of negligence, because Galligan hoarded the email and failed to keep his own client informed. This is hardly plausible. Whether Galligan forwarded Plaintiff's emails and Galligan's credibility are issues for a trier of fact.

Plaintiff's August 7, 2011 email states that, in her experience, big law firm partners such as Galligan and the Sidley partner are offensive and dishonest in such matters, and that such negative experiences affected her complaints about the building worker and Galligan's investigation. Galligan would have easily gleaned that the previous negative experiences involved Debevoise, based on the commentary Plaintiff included when she forwarded Galligan's "letter closing investigation" to Debevoise on June 24, 2011, a forward on which Galligan was copied. Because these two emails link the co-op sexual harassment issues with employment discrimination at Debevoise, Galligan and Debevoise had a common adversary in Plaintiff. On

4

this basis alone, it is plausible, and in Plaintiff's view, likely, that Galligan forwarded all of Plaintiff's emails to Debevoise.

Plaintiff has other information supporting her belief. Debevoise, the Dewey partner, or Mike Sirkin at Proskauer appear to have forwarded an emotional, personal email from Plaintiff to them on July 5, 2011, to Galligan (or possibly other Seyfarth lawyers). While Galligan was expressly not copied on this email, Plaintiff could tell when she ran into Board members of her co-op, Galligan's client, that they knew about and were moved by Plaintiff's July 5, 2011 email. The email explains in detail the nightmare in the co-op, information that would have been very helpful to Galligan and Seyfarth. Such information-sharing provides a reason for Galligan to reciprocate the favor by forwarding, directly or indirectly, Plaintiff's emails of August 7 and September 5, 2011, and Plaintiff's two emails of November 4, 2011, to Debevoise and the other lawyers. All lawyers had incentives to share information about Plaintiff, because not only Seyfarth and Sidley, but also Debevoise, and lawyers at Dewey and Proskauer were all linked to the situation in the co-op (see Comp. §§6, 19, 22, 24, 32 and 36).

Extensive comments on Above the Law, published by defendant Breaking Media, Inc., aimed wholly or in part at Plaintiff and the situation in her co-op, show that this is exactly what Galligan did – sent Plaintiff's emails directly or indirectly to Debevoise and other parties who made these comments (Comp. §32). Contrary to the claim in Galligan's motion to dismiss that Plaintiff has not alleged evidence to support her belief, the Complaint does allege such evidence (see Comp. §§7, 32 and 34). More specifically:

(a) Shortly after Plaintiff's August 7, 2011 email to Galligan that was so critical of the Sidley partner, on an Above the Law thread involving a death, a commenter wrote something

5

to the effect of "Forget about this person – how about killing a Sidley partner." The thread had nothing to do with Sidley. This "non-sequitur" comment was about something else, such as Plaintiff's email to Galligan. The comment was removed.

(b) On August 17, 2011, a commenter who was undoubtedly a Debevoise partner wrote a rant about "you people" ostensibly directed at the Sidley partner. Partners at Debevoise would have recognized "you people" as an allusion to something Plaintiff said to Rick Evans, former presiding partner at Debevoise (which he misinterpreted), during his withering attack of Plaintiff in October 2004. Plaintiff described the Sidley partner, implicitly also describing Rick Evans, in an email to Debevoise in 2010. Plaintiff's August 7, 2011 email to Galligan demonstrated in detail that the Sidley partner had done to Plaintiff what Rick Evans had done to Plaintiff in October 2004 – used a bogus, implausible pretext to shoot down Plaintiff and her bona fide claims, leaving Plaintiff in each case in a horrible situation. The Debevoise partner who undoubtedly made this comment must have read Plaintiff's August 7, 2011 email to Galligan in order to pick up on the comparison. The rant also criticized lawyers' standard of "evidence," an allusion to Galligan's "letter closing investigation" falsely indicating that Plaintiff had not provided evidence of her claims, and lamented that lawyers are everywhere, such as on co-op boards. Debevoise's leadership has treated Plaintiff so horribly in violation of Title VII that postings from presumably less powerful partners at Debevoise in support of Plaintiff, such as this one, have appeared regularly on Above the Law at least since the Dokupil post in November 2009. On this basis, Plaintiff's August 7, 2011 was shared with Galligan. The rant was toned down after the fact, with "you people" deleted.

(c) On August 18, 2011, a commenter who sounded like a senior leader at a big law firm
(most likely, Sidley) protecting one of his own, wrote a vicious screed in one of a series
of popular threads about Gregory Berry, a male ex-associate suing his law firm for $77
million.  The screed indicated that associates, like Plaintiff, who attempt to stand up to
big law firms are "sociopaths" (like the building worker in Plaintiff's co-op), losers and
have sexual issues.  A wave of vicious, misogynist, black-is-white comments on this and
later threads, sounding like younger lawyers "climbing on the bandwagon" of their
leader, were also clearly directed, in whole or in part, at Plaintiff (Comp. §32; see also
Comp. §22).  Comments were along the familiar lines of:  female lawyers are crazy;
Plaintiff, rather than the building worker, has a personality disorder; Plaintiff overreacts
on minor issues; Plaintiff is self-absorbed and lacks empathy for the Sidley partner; the
building worker picks on Plaintiff because Plaintiff lacks empathy and social skills.  At
one point in her August 7, 2011 email, Plaintiff wrote that the Sidley partner and the
Board of her co-op had shown a "jaw dropping" lack of regard of shareholder privacy.
As if to ridicule Plaintiff and her email, a commenter wrote, ostensibly about an email
Gregory Berry had sent, "My jaw dropped when I saw that email."  One comment jeered
that no one could tie the comments to a partner.  "Bring back Dokupil," a jeering
reference to the Veronica character in the defamatory Dokupil post in November 2009,
which is based on Plaintiff and sex discrimination at Debevoise, was in this wave (Comp.
§§31 and 32).  Many comments were non-sequiturs.  For example, a lawyer made a
positive comment saying that she too had suffered from the "too pretty to be a lawyer"
stereotype, and urged someone, like Plaintiff, to fight the battle and not let it go.

7

Gregory Berry is a man and, judging from his photo showing Scotch tape across the bridge of his glasses, was hardly a "pretty boy" type. Gregory Berry showed no signs of letting his battle go — he was suing for $77 million even though he had previously signed a release of claims in exchange for severance. While these comments possibly could have arisen through channels other than Plaintiff's August 7, 2011 email to Galligan, the partner vs. associate controversy was set forth most clearly in this email.

(d) In response to an escalating situation in her co-op, Plaintiff sent Galligan an email on September 5, 2011, which at one point referred to the building worker's previous behavior as like something out of "a Charles Bronson films" *[sic]*. Shortly thereafter, an Above the Law commenter wrote that a certain place was like New York in a Charles Bronson film. Charles Bronson, who was popular in the 1960's and 70's, was rarely, if ever, invoked on Above the Law. A person or people from Debevoise routinely "quote" Plaintiff and her writings, apparently to show support for her and her cause. On this basis, Plaintiff's September 5, 2011 email to Galligan was shared with Debevoise.

(e) The vicious and belligerent Apartment Murder comment on Above the Law on November 16, 2011 by defendant Doe 6 appeared on the thread "Stephen McDaniel Indicted for the Murder of Lauren Giddings" (see Comp. §7 (clause (vi), §§20 and 34)). This was one of the series of threads about the murder of a female law student after the alleged perpetrator, another law student, had stolen condoms from her apartment. Plaintiff has alleged that the building worker in her co-op has moved or stolen small items from her apartment. Plaintiff's November 4, 2011 emails to Galligan provide evidence of or describe three communications from the building worker that could

8

reasonably be construed as death threats.  Like the ongoing Gregory Berry threads with the partner vs. associate themes, the ongoing Lauren Giddings murder threads with its similarities to the co-op situation provided a forum for Above the Law commenters to abuse (or support) Plaintiff.  The belligerent and highly offensive Apartment Murder comment, "Honestly, I don't care what your evidence is.  Whatever it is, you just need to get over it," was yet another non-sequitur.  It's not clear from the routine and ordinary thread about a wholly expected indictment who "you" would be, or what offer of "evidence" was so troublesome.  The comment and its aggression seem to be directed at someone else, like Plaintiff.  Plaintiff immediately recognized this as a humiliating, public slap in the face directed at her and her November 4, 2011 emails to Galligan (see Comp. §34), as did at least two other Above the Law commenters.  One commenter angrily accused someone from Sidley of making this belligerent attack on Plaintiff.  The comment, which was removed, referred to a "mortgage backed securities lawyer," an obvious reference to Sidley's practice area that affected the U.S. economy so negatively.  The implication was that such a lawyer would be blind to the lurking "housing crisis" that Plaintiff's November 4, 2011 emails were trying to avert.  The Lauren Giddings murder had nothing to do with mortgage backed securities.  The second commenter called the Apartment Murder comment "severely underrated."  It's not clear what would be so great about the Apartment Murder comment, even by the highly misogynist and bizarre standards of the blog at that time, that would cause it to be "underrated," if the comment referred plainly and simply to some unexplained type of "evidence" in the wholly expected indictment ostensibly at issue.  If the Apartment

Murder comment was a response to Plaintiff's November 4, 2011 emails to Galligan, and

particular if the response originated from Debevoise whose partners had previously,

directly or indirectly, in highly offensive fashion, told Plaintiff to "get over" future

damage caused by its employment discrimination at least three times, then the

"severely underrated" comment would make a lot more sense in its context.

If Galligan didn't forward, send or distribute Plaintiff's emails, directly or indirectly, then

it is plausible that Galligan himself made all of the Above the Law comments described above,

including the Apartment Murder comment.  In this case, the claims for emotional distress are

even stronger than what is alleged in the Complaint, and the motion to dismiss should not be

granted.  Galligan's contribution to the harassing comments on Above the Law based on emails

Plaintiff sent to him and no one else, is an issue for a trier of fact.

## II.    Galligan's Wrongdoing Includes His Disingenuous, High-handed "Investigation"

In minimizing Galligan's wrongdoing, Galligan's motion to dismiss elides over allegations

in the Complaint that Galligan conducted a cursory investigation of the building worker, based

on a complaint of sexual harassment of another woman, and then pinned the onus of the

investigation on Plaintiff, leaving Plaintiff and others to face the retaliatory rage of the building

worker alone (Comp. §32).  Galligan notified Plaintiff in a letter dated May 12, 2011 about the

investigation, implying that it was based on Plaintiff's emails to the managing agent.  Plaintiff's

last email, dated January 26, 2011, wasn't serious enough to inspire an investigation by outside

lawyers, and even if it had been, the co-op Board wouldn't have waited over three months to

retain Galligan.  On the contrary, Plaintiff had notice that a woman had made a "grave"

accusation involving the building worker in the spring 2011.  When Plaintiff met with Galligan

later in May, rather than being honest and straightforward about what had prompted his investigation, Galligan began by claiming that Plaintiff had made a "serious" allegation about kickbacks, as if to justify his investigation on that implausible basis.  With such intent to deceive and take advantage of Plaintiff from the beginning, it's little wonder that Galligan's "investigation" of the building worker resulted in such life-upending events over many months for Plaintiff in her own home, and harassment of Plaintiff on a misogynist legal blog in connection with her successfully protecting herself from the building worker.

Galligan's investigation was high-handed and amounted to setting Plaintiff up to fail. Galligan expected Plaintiff to provide "evidence" of the building worker's sexual harassment of the housekeeper (Comp. §32), evidence which Plaintiff never claimed to have, and which was not reasonable to expect Plaintiff to provide.  Plaintiff was not the building worker's supervisor. Several times during her meeting with Galligan, it was clear that he was under the sway of implausible pretexts the co-op Board had used to undermine Plaintiff, including that Plaintiff voluntarily chooses to use the building worker to do work in her apartment.  What made this pretext so maddening is that it was belied by the very email chain Galligan claimed to have prompted his investigation.  That email chain sets forth quite clearly that the managing agent had reneged, twice, on a hard-fought deal Plaintiff had struck to keep the building worker from being involved in any way in co-op work (or private work for that matter) being done in Plaintiff's apartment.  In his "cursory" investigation, Galligan appeared not to have read or considered the very email chain, the basis on which he purportedly had been retained.

The motion to dismiss states that Plaintiff forwarded Galligan's "letter closing investigation" to Debevoise "for unstated reasons to an unidentified end." In fact, the

Complaint states that Plaintiff was hoping Debevoise would be able to do something to forestall the building worker's inevitable retaliatory rage (Comp. §32). Previously, Plaintiff had gone to the police twice, spoken to a lawyer three times, contacted police authorities again, participated in the co-op's political process to help new Board members get elected, and voluntarily participated in Galligan's investigation to help others and herself. Plaintiff didn't know what else to do, and hoped (in vain, it turned out) that one of the big law firm partners would be able to use influence to sway the investigation. But there was another reason Plaintiff forwarded the "letter closing investigation" to other lawyers – to put Galligan and the disingenuous nature of his investigation on the spot. In this regard, Plaintiff was more successful. After Plaintiff forwarded Galligan's high-handed and disingenuous "letter closing investigation" to other lawyers, with commentary, it appeared Galligan re-opened the investigation, contacting one of Plaintiff's sources he had previously dismissed as apparently not worth his time. Galligan's investigation was so "cursory" and "highly undermining" of Plaintiff (Comp. §32), Galligan initially wasn't willing to spend the time, or show Plaintiff the respect, to follow up with Plaintiff's source to see what else the source may have known. In fact, Galligan's investigation was not a good-faith attempt to build a record against the building worker. It was an investigation of Plaintiff, to see what Plaintiff knew and how much Plaintiff could prove about another woman's allegation that was obviously quite serious.

Galligan's high-handed attempt to pin the onus of his investigation on Plaintiff, as if Plaintiff were the building worker's supervisor and responsible for policing his alleged sexual harassment of housekeepers, is the type of offensive disrespect shown Plaintiff that invited the building worker's retaliation and that set the stage for cyber-bullying on Above the Law.

12

Galligan in his "letter closing investigation" claimed Plaintiff had been unable to provide any

evidence of the building worker "bullying" Plaintiff in retaliation for her complaints to the co-op

Board and managing agent (see Comp. §32). In fact, the building worker had retaliated against

Plaintiff, tried to intimidate Plaintiff, and/or taunted Plaintiff for complaining about him a

minimum of twelve times, each reflected in the paper trail Plaintiff began in 2008, which

Galligan either didn't consider or ignored in his "cursory" investigation. Two such incidents

took place during Galligan's investigation itself, in full view of the building's security cameras.

The plain implication of Galligan's insulting statement was similar to the sentiments expressed

in the misogynist cyber-bullying on Above the Law – that Plaintiff is a crazy, over-reacting

female lawyer. In this, Galligan showed a flagrant disregard of what Plaintiff saw as a

substantial probability that the building worker would retaliate against Plaintiff, her sources of

information she named in the investigation, and/or others in the building. It's a reasonable

inference that Galligan showed the same flagrant disregard of a substantial probability of harm

to Plaintiff in the legal community and on Above the Law because of his investigation.

Plaintiff's emails to Galligan turned out to be highly effective self-help in protecting

herself from the building worker's retaliatory rage and ameliorating the tension with him. That

such emails gave rise to retaliatory comments on Above the Law illustrates a familiar "no-win"

situation in which Plaintiff found herself – Galligan and the other lawyers failed to protect

Plaintiff, and then when Plaintiff protected herself, she suffered injury at their hands. It's a

reasonable inference that the apparent sexism inherent in Galligan's investigation, the

misogynist Above the Law comments, and Debevoise's employment discrimination all sprung

from the same discriminatory animus, and that Galligan's wrongdoing inevitably and foreseeably gave rise to the harm to Plaintiff at issue.

III.   **Galligan Owed a Duty of Care to Plaintiff, Especially after Plaintiff put Galligan on Notice of the Harassing Above the Law Comments**

Galligan's motion to dismiss claims that Galligan owed no duty directly to Plaintiff.  In fact, as the co-op's lawyer retained to do an investigation of the building worker, Galligan was acting as an agent of the co-op, and all protections pursuant to Plaintiff's proprietary lease, as well as express and implied under the law in respect of the building worker's harassment of Plaintiff, would apply to harassment due to Plaintiff's participating in Galligan's investigation. As a shareholder in the co-op that retained Galligan, Plaintiff was surely entitled to respect on that basis.  Section 4.4(a) of the New York Rules of Professional Conduct, regarding Respect for Rights of Third Persons, prohibits a lawyer representing a client from using means that have no substantial purpose other than to embarrass or harm a third person, such as cyber-bullying.

However, regardless of whether a duty of care was previously implied, a duty of care to Plaintiff undoubtedly attached when Plaintiff put Galligan on notice in her main November 4, 2011 email that she was being harassed on Above the Law as a result of his investigation, and mentioned career damage (Comp. §34).  Whether Galligan fulfilled his duty of care is an issue for a trier of fact.

IV.   **Plaintiff's Claims for Emotional Distress Are Sufficiently Alleged**

Galligan's motion to dismiss cites a four-part test (the "four-part test"), to sufficiently allege a claim for intentional infliction of emotional distress.  Contrary to what is claimed in Galligan's motion to dismiss, the Complaint, liberally construed, alleges all of the elements of

the four-part test.  Under the four-part test, Plaintiff must first plead "extreme and outrageous

conduct."  A trier of fact may properly find that (i) Galligan's disingenuous, high-handed

investigation, the onus of which he improperly pinned on Plaintiff, his highly undermining

denial of the building worker's retaliation against Plaintiff in his "letter closing investigation,"

and abandonment of Plaintiff to face the building worker's retaliation alone (Comp. §32); (ii)

Galligan's forwarding of Plaintiff's email responses to his investigation to Debevoise (and other

lawyers) in circumstances which would indicate collusion with the other big law firm partners

against their common adversary (see also Comp. §§5, 6, 19, 22, 34 and 36); (iii) the campaign

against Plaintiff on Above the Law, based on emails Plaintiff sent to Galligan, and no one else,

which turned highly personal with baiting, harassing comments with Plaintiff's name and

personal references (Comp. §32), and (iv) the belligerent Apartment Murder comment intended

to publicly humiliate Plaintiff for continuing to speak up about "troubling, recent, escalating

conduct of the building worker" and "disturbing patterns" (that is, communications that could

reasonably be construed as death threats) (Comp. §34), constitute "extreme and outrageous"

conduct.  That the cyber-bullying took place on a widely-read legal blog, and Plaintiff had

suffered and complained about career damage to both her co-op Board and Galligan (Comp.

§34), may also support such a finding.  The belligerent and highly offensive Apartment Murder

comment, after Plaintiff specifically put Galligan on notice that she had had enough of such

harassment, was a manner of terrorizing Plaintiff.  Plaintiff was trying to address potential

future damage by a "highly problematic" individual Plaintiff had found "troubling" and

"disturbing" (Comp. §§6 and 23) and who Plaintiff reasonably believed, rightly or wrongly, could

be capable of great harm.  This was not a case of "mere insults, indignities and annoyances."

The second prong of the four-part test is that Plaintiff must plead "intent to cause, or disregard of a substantial probability of causing, severe emotional distress." Plaintiff plausibly alleges that the Apartment Murder comment was made intentionally to humiliate Plaintiff based on Plaintiff's November 4, 2011 email to Galligan (Comp. §34), an email that Plaintiff shared with no one else. If Galligan himself didn't make the comment, it is a reasonable inference that Galligan disregarded a substantial probability that such a belligerent, publicly humiliating attack would be made, based on his denial and disregard of retaliation by the building worker and highly undermining conduct generally (Comp. §32), and the implication throughout the Complaint that big law firm partners routinely work together to undermine employment discrimination and harassment claims (see Comp. §§5, 6, 19, 22 and 36). While the four-part test does not mention the violation of a duty, Plaintiff alleges that Galligan did have a duty of care (see Section III of this affirmation), which would make Galligan's "disregard" of harm to Plaintiff all the more actionable.

Given the anonymous nature of the Apartment Murder comment, Plaintiff cannot plead with any more specificity Galligan's precise role in causing the Apartment Murder comment to be made. It is unjust to expect Plaintiff to do so under the circumstances. Galligan ignored Plaintiff's request to provide more information on how the Apartment Murder comment came to be made (Comp. §13), hardly a ringing endorsement of non-involvement. Galligan's motion to dismiss completely fails to mention this. The Complaint also sets forth that Plaintiff attempted, without success, to obtain the charge file from the Equal Employment Opportunity Commission (Comp. §13). Finally, all three named defendants, including Galligan, objected to interrogatories Plaintiff served together with the Complaint, in accordance with instructions

16

from the Court's pro se desk, regarding identification of the John Doe plaintiffs and how the Apartment Murder comment came to be made.  Plaintiff cannot plead to specific information Galligan and the other parties have refused to provide regarding anonymous harassment of Plaintiff she plausibly alleges was responsive to emails she sent to Galligan and no one else.  All three named defendants have interests in common, irrespective of Plaintiff's Complaint, and on this basis have incentives to cover for one another.

The third prong of the four part test is a "causal connection between the conduct and the injury."  The Complaint does allege such a causal relationship, not narrowly as to Galligan's mere forwarding of Plaintiff's emails, but in the broader context of Galligan's wrongdoing.  The relevant Above the Law comments would not have been made but for Galligan's disingenuous, high-handed investigation, the onus of which he improperly put on Plaintiff, Galligan's denial and disregard of the potential for retaliation by the building worker, and Plaintiff's obvious need to respond to such a high-handed investigation in order to protect herself, which Galligan and other lawyers had failed to do (Comp. §32) and in which she was ultimately successful. That Galligan's investigation and the cyber-bullying comments appear to have shared the same discriminatory animus, and the suggestion that detrimental information-sharing is common in the legal industry (see Comp. §§5, 6, 19, 22 and 36), made the potential for harm of this nature all the more foreseeable, especially  after Galligan was put on notice of the baiting, harassing comments (Comp. §34).  Plaintiff has plead evidence that the Above the Law comments were based on her emails to Galligan (Comp. §7), more specifically described above in Section I of this affirmation.  The Complaint alleges that the harassing Above the Law comments and the

Apartment Murder comment were directly responsible for her harm, which is entirely plausible (Comp. §§7 (clauses (vi) and (vii), 32, 33, 34 and 25).

The final prong of the four part test is "emotional distress." Plaintiff has plead "emotional distress" in abundance, again not narrowly in response merely to Galligan forwarding Plaintiff's emails, but more broadly in connection with Galligan's disingenuous and high-handed investigation, and its aftermath. Plaintiff has described the situation with the building worker and his actions as "bizarre," "troubling," "life-ruining" and a "life-ruining nightmare," a "threat," "truly unnerving," and "disturbing" (Comp. §§6, 22, 23, 24 and 34 ). Being cyber-bullied because Plaintiff participated in Galligan's investigation in good faith, and then protected herself from the building worker's retaliation, would inevitably magnify all these emotions. Plaintiff alleges emotional distress arising directly as a result of Above the Law comments responsive to Plaintiff's emails to Galligan (Comp. §§32, 33, 34 and 35). Most significantly, the Apartment Murder comment came at a time when Plaintiff was interviewing for a job in her field, as well as undergoing sensitive medical treatment regarding fertility, a highly stressful combination even without additional complications. Plaintiff alleges that "the great popularity of the Apartment Murder comment with the e-mob on Above the Law," plainly evident in November 2011 and the spring of 2012, was indicative of malice, and compared the discriminatory animus evident therein directly to several previous instances of egregious employment discrimination at Debevoise (Comp. §35). Plaintiff alleges that generally "[s]uch harassment and retaliation [from Debevoise] has had a severely negative impact not only on Plaintiff's career and legal practice, but her self-confidence, self-esteem, sense of well-being, physical and mental health, and sensitive medical treatment" (Comp. §8), and that it has

18

additionally been "demoralizing" in a way that has caused Plaintiff great harm (Comp. §6). Plaintiff has suffered considerable emotional distress and injury caused thereby, and is entitled to relief from Galligan and the other defendants in view of the same.

Galligan's motion to dismiss also claims that Galligan did not owe a duty to Plaintiff that would properly support a cause of action for negligent infliction of emotional distress. On the contrary, Galligan did owe a duty to Plaintiff (see Section III of this affirmation). Galligan's motion to dismiss also claims that Galligan's actions did not create a threat to Plaintiff's physical safety, and that Plaintiff has not alleged this in the Complaint. On the contrary, Plaintiff did fear for her own safety as a result of Galligan's investigation, as the "escalating situation" and the "disturbing patterns" of the building worker described in her November 4, 2011 email (that is, what Plaintiff perceived as potential "death threats") make clear (Comp. §34). Plaintiff made several comments to Galligan during his investigation and in her email responses to him (*e.g.,* the reference to "Charles Bronson films" such as Death Wish, involving rape and murder in a New York apartment), that put Galligan on notice to this effect. The fear was magnified because of Galligan's disingenuous, insulting and undermining treatment of Plaintiff, and implicit support of the building worker by Galligan and his client, the building worker's employer. Plaintiff has properly plead a cause of action for negligent infliction of emotional distress.

## V.     Plaintiff is Entitled to Relief from Galligan for Emotional Distress

As stated in the Complaint, Plaintiff seeks compensation for emotional distress and injury resulting from emotional distress from all defendants, including Galligan. Plaintiff seeks reasonable attorney fees and expenses incurred by Plaintiff in prosecution of her actions

19

against Debevoise solely from Debevoise.  Plaintiff undertakes to amend the Complaint, at the Court's discretion, to make this clarification.

In view of the foregoing, it is respectfully submitted that Galligan's motion to dismiss should be denied.

**I declare under penalty of perjury that the foregoing is true and correct.**

Dated:   January 10, 2013
              New York City, New York

By: _Sara J. Van Dyke_
       Sara J. Van Dyke

Sara J. Van Dyke, pro se
20 East 35th Street, Apt. 14L
New York, New York  10016
(212) 725-2706 *phone and fax*
sjvdnyc@hotmail.com *email*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SARA J. VAN DYKE, | Judge Daniels |
| Plaintiff, | Civil Action No. 12 CV 8354 |
| -against- | |
| | **AFFIRMATION OF SERVICE** |
| Partners of DEBEVOISE & PLIMPTON LLP, BREAKING MEDIA, INC., PAUL GALLIGAN, and DOES 1 - 6, | |
| Defendants | |

I, Sara J. Van Dyke, declare under penalty of perjury that I have served a copy of the attached Affirmation in Opposition to Defendant Paul Galligan's Motion to Dismiss upon Jeffrey Craig Miller and David S. Korzenik of Miller Korzenik Sommers LLP, attorneys for defendant Breaking Media, Inc., whose address 488 Madison Avenue, Suite 1120, New York, New York, 10022, via personal delivery.

Dated:  January 10, 2013
        New York City, New York

By:  _Sara J Van Dyke_
        Sara J. Van Dyke

Sara J. Van Dyke, pro se
20 East 35th Street, Apt. 14L
New York, New York  10016
(212) 725-2706 *phone*
sjvdnyc@hotmail.com *email*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SARA J. VAN DYKE, | Judge Daniels |
| Plaintiff, | Civil Action No. 12 CV 8354 |
| -against- | **AFFIRMATION OF SERVICE** |
| Partners of DEBEVOISE & PLIMPTON LLP, BREAKING MEDIA, INC., PAUL GALLIGAN, and DOES 1 - 6, | |
| Defendants | |

I, Sara J. Van Dyke, declare under penalty of perjury that I have served a copy of the

attached Affirmation in Opposition to Defendant Paul Galligan's Motion to Dismiss upon Edwin

G. Schallert and Vanessa De Simone of Debevoise & Plimpton LLP, attorneys for defendant

Debevoise & Plimpton LLP, whose address is 919 Third Avenue, New York, New York, 10022, via

personal delivery.

Dated:  January 10, 2013
        New York City, New York

By: _____
        Sara J. Van Dyke

        Sara J. Van Dyke, pro se
        20 East 35th Street, Apt. 14L
        New York, New York  10016
        (212) 725-2706 *phone*
        sjvdnyc@hotmail.com *email*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SARA J. VAN DYKE, | Judge Daniels |
| Plaintiff, | Civil Action No. 12 CV 8354 |
| -against- | |
| | **AFFIRMATION OF SERVICE** |
| Partners of DEBEVOISE & PLIMPTON LLP, BREAKING MEDIA, INC., PAUL GALLIGAN, and DOES 1 - 6, | |
| Defendants | |

I, Sara J. Van Dyke, declare under penalty of perjury that I have served a copy of the

attached Affirmation in Opposition to Defendant Paul Galligan's Motion to Dismiss upon Eddy

Salcedo and Melissa Starcic of Seyfarth Shaw LLP, attorneys for Paul Galligan, whose address is

620 Eighth Avenue, New York, New York, 10018, via personal delivery.

Dated:  January 10, 2013
          New York City, New York

By:  _____
          Sara J. Van Dyke

Sara J. Van Dyke, pro se
20 East 35th Street, Apt. 14L
New York, New York  10016
(212) 725-2706 *phone*
sjvdnyc@hotmail.com *email*